UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEVILLE COWARD,

                    Plaintiff,

     -v-

THE TOWN AND VILLAGE OF HARRISON, THE
POLICE DEPARTMENT FOR THE TOWN AND
VILLAGE OF HARRISON, THE RECREATION
DEPARTMENT FOR THE TOWN AND VILLAGE
OF HARRISON, LIEUTENANT FRANK
BISCEGLIA, individually and in his capacity as an
employee of the Police Department of the Town and
Village of Harrison, DETECTIVE GARY
CHIARELLA, individually and in his capacity as an
employee of the Police Department of the Town and
Village of Harrison, RALPH TANCREDI,
individually and in his capacity as an employee of the
Police Department of the Town and Village of
Harrison, STEPHEN MALFITANO, individually and
in his capacity as the Supervisor/Mayor of the Town
and Village of Harrison, RONALD BELMONT,
individually and in his capacity as Superintendent of
the Recreation Department of the Town and Village of
Harrison, MARGARET MINISHI, individually and in
her capacity as an employee of the Recreation
Department of the Town and Village of Harrison, and
JOHN DOE One through Ten, individually and in
their capacity as employees of the Police Department
for the Town and Village of Harrison,

                    Defendants.

---

Case No. 04-CV-5976 (KMK)

<u>OPINION AND ORDER</u>

Appearances:

Joseph R. DeMatteo, Esq.
Jeffrey L. Bernfeld, Esq.
DeMatteo & Bernfeld, LLP
New York, NY
*Counsel for Plaintiff*

Steven J. Harfenist, Esq.
Charles H. Horn, Esq.
Neil S. Torczyner, Esq.
Friedman, Harfenist, Langer & Kraut
Lake Success, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Neville Coward ("Plaintiff") brings this action, pursuant to 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 2000a ("Section 2000a"), and state law, alleging that in the spring of 2003 the Town and Village of Harrison ("Harrison") and several of Harrison's officials and employees (collectively, "Defendants") subjected Plaintiff to, inter alia, false arrest, malicious prosecution, unreasonable search and seizure, and racially discriminatory exclusion from a public park. Defendants have moved for partial summary judgment. For the reasons stated herein, Defendants' motion is granted in part and denied in part.

## I.  Background

### A.  Plaintiff's May 3, 2003 Arrest

Plaintiff, an African-American male resident of Harrison (Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 1), was part of "[a] group of young adult males" who would play pickup baseball games at various parks in the vicinity of Harrison (Decl. of Joseph DeMatteo ("DeMatteo Decl.") Ex. A (Dep. of Neville Coward ("Pl. Dep. A") 47)).  A few months before May 2003, Plaintiff was playing baseball at Silver Lake Park (the "Park") in Harrison, and was

2

approached by a man named Mark Jaffe ("Jaffe").  (*Id.* 53.)  Jaffe expressed interest in Plaintiff

helping Jaffe's son to improve his baseball skills, and Plaintiff and Jaffe exchanged phone

numbers.  (*Id.* 53-55.)

Jaffe invited Plaintiff to watch Jaffe's sons play a Harrison Recreation League baseball

game at the Park on May 3, 2003, and Plaintiff arrived at the Park between 2:00 and 3:00 p.m. on

that date.  (Def.'s 56.1 ¶ 2; Pl. Dep. A 104-05; DeMatteo Decl. Ex. L (Trial Testimony of Mark

Jaffe ("Jaffe Testimony") 4-6.)  Also playing in the game, among the other children aged

approximately eleven or twelve, was Gerard Weinstein, a boy that Plaintiff had previously met

through Jaffe.  (Pl. Dep. A 45, 134-35, 146.)  According to Plaintiff, during the game Plaintiff

was "calling out" to one of Jaffe's sons, who was playing third base, and to Weinstein, who was

pitching, telling them to "remember[] certain . . . fundamentals that [they] worked on," such as

getting their body behind the ball when fielding and taking care not to injure themselves by

throwing too hard.  (*Id.* 45, 145-47.)  Plaintiff was positioned in foul territory, approximately ten

feet from the third-base line, and about ten feet in front of the bleachers.  (*Id.* 147-48.)  At a

hearing prior to his deposition, Plaintiff testified that he did not "observe any other adults

advising the children on how to play," stating that the other adult spectators were "just

observing."  (Decl. of Neil Torczyner, dated Dec. 10, 2008 ("Torczyner Reply Decl."), Ex. A

(Mun. Hr'g Tr., dated Dec. 1, 2003), at 85-86.)

Plaintiff testified at his deposition that, after one or two innings, he left his position near

the third-base line, and "wandered off to go exercise," which had been his primary reason for

coming to the Park.  (Decl. of Neil Torczyner, dated Sept. 17, 2008 ("Torczyner Decl."), Ex. E

(Dep. of Neville Coward ("Pl. Dep. B") 159-60).)[1]  Plaintiff went to exercise behind some

bleachers, approximately forty-five to fifty yards from the baseball game.  (Defs.' 56.1 ¶ 5.)  He

then saw Defendant Gary Chiarella, an off-duty Harrison police detective, "walking into the

practice area beyond the bleachers where [Plaintiff] was located."  (Pl. Dep. A 164; Defs.' 56.1

¶ 6.)  As Chiarella "walked past [Plaintiff]," Plaintiff said to him

> something to the effect that if he needed — I was trying to say do you need
> someone to catch behind the kids, to field the ball behind the kids? . . . I said
> something to the effect that can I play along with you guys or join you guys,
> something to that effect. . . . I was trying to say, since you have a few kids, that
> the ball usually will pass the kids and did you want, you know, an adult that
> would save you the trouble since you really want to get a full practice session in
> with the kids.

(Pl. Dep. A 164-65; Defs.' 56.1 ¶ 6.)  Plaintiff was about three feet away from Chiarella and

made this offer in a conversational tone.  (Pl. Dep. A 171.)  Chiarella did not respond to Plaintiff,

and Plaintiff continued exercising.  (Defs.' 56.1 ¶ 8.)  Plaintiff's exercises included "stretching,

cal[i]sthenics, jumping jacks and pitching motions."  (*Id.* ¶ 9.)

According to Chiarella, when he was walking into the Park with his son and another ten-

or eleven-year-old boy to warm up for a Little League game, Plaintiff

> came up to me, directly up to me, to my face, and with the baseball glove on and a
> ball.  While he is pounding his mitt he said, Coach, do you need any players.  I
> was, like taken back.  I just said, No, we don't need any players.  You are a little
> too old to play with these guys.  And I continued on another maybe 20 feet to the
> other side of the bleachers and started putting our stuff down.

(Torczyner Decl. Ex. F. (Dep. of Gary Chiarella ("Defs.' Chiarella Dep.") 19).)  As Chiarella

and his son put on their cleats, Chiarella noticed that Plaintiff was "pounding his ball in his mitt,

---

[1] "Pl. Dep. A" and "Pl. Dep. B" are transcripts of the same deposition of Plaintiff; the
Court distinguishes them because Plaintiff and Defendants excerpted different portions of the
deposition in their exhibits.

stretching, doing calisthenics, looking like he is getting ready to play." (*Id.* 20.) Chiarella saw Defendant Margaret Minishi, a Recreation Department supervisor, and told her about Plaintiff's behavior that Chiarella had just observed. (*Id.*) Minishi told Chiarella that "she had a problem with [Plaintiff] earlier," namely, "that he was standing by the main baseball field where the game was going on and critiquing the kids playing, telling them they were no good and telling them other things." (*Id.*) Minishi told Chiarella that "she asked [Plaintiff] to leave." (DeMatteo Decl. Ex. D (Dep. of Gary Chiarella ("Pl.'s Chiarella Dep.") 30.)[2] However, according to Jaffe, Plaintiff was not "doing anything different from [the type of] parents that yell out encouragement and critiques" during their children's baseball games, and was not doing anything that made Jaffe feel he should be removed. (DeMatteo Decl. Ex. F (Dep. of Mark Jaffe ("Jaffe Dep.") 81-82).)

Chiarella called the police precinct and related the incident to Defendant Frank Bisceglia, a Harrison police lieutenant, though his intent was not to have Plaintiff arrested. (Pl.'s Chiarella Dep. 42.) According to Chiarella, Plaintiff was not "insistent" on playing baseball with Chiarella and the children, and Chiarella did not tell Bisceglia anything to the contrary. (*Id.* 30, 33.) According to Bisceglia, Chiarella told him that Plaintiff "was being disruptive and scaring the parents and their children." (DeMatteo Decl. Ex. J (Dep. of Frank Bisceglia ("Bisceglia Dep.") 49.) Chiarella also told Bisceglia that Minishi had told Plaintiff to leave. (*Id.*)

Bisceglia testified that he arrived in the Park and saw Plaintiff "pretending to throw [a] ball toward the crowd, where there were people sitting." (*Id.* 42.) Bisceglia himself was "a little

---

[2] "Pl.'s Chiarella Dep." and "Defs.' Chiarella Dep." are transcripts of the same deposition of Chiarella; the Court distinguishes them because Plaintiff and Defendants excerpted different portions of the deposition in their exhibits.

alarmed" when Plaintiff "turned toward [him] and . . . pretended to throw the ball," because "for a second, [Bisceglia] thought he was going to throw the ball at [Bisceglia]." (*Id.*) Plaintiff testified that Bisceglia appeared in uniform at the top of a hill and shouted at Plaintiff to go away. (Pl. Dep. A 186.) Bisceglia also said: "'You didn't hear what I said? You ignoring me? You crazy?'" (*Id.* 187.) Bisceglia walked down the hill toward Plaintiff, told Plaintiff that he was under arrest, grabbed Plaintiff's arm, forced him up against the bleachers, and handcuffed him. (Pl. Dep. B 188.) Plaintiff was then transported by car to the Harrison police precinct, where he received a desk appearance ticket; thereafter, he was driven back to the Park and released. (Defs.' 56.1 ¶¶ 13-14.) Plaintiff testified at his deposition that he was at the police precinct for between thirty minutes and an hour (*id.* ¶ 14), though he had testified at a previous hearing that he had been under arrest for "approximately two hours" (Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶ 12).

Bisceglia signed a criminal complaint against Plaintiff, dated May 3, 2003, accusing Plaintiff of "[h]arassment in the second degree," stating that

> [Plaintiff] did intentionally harass, annoy and alarm children, coaches and the recreation supervisor who were trying to play baseball within the Silver Lake Park. [Plaintiff] did shout repeated insults and insist that he be allowed to play with the 10 and 11 year old children who were involved in the game. [Plaintiff] despite being asked by both coaches and the Harrison Recreation supervisor to stop continued his irrational and alarming behavior.

(Torczyner Decl. Ex. H (May 3, 2003 Criminal Compl.).)

B.  Plaintiff's Exclusion from the Park and May 31, 2003 Detention

Plaintiff's appearance ticket instructed him to appear in Justice Court on May 16, 2003. (Torczyner Decl. Ex. G (Appearance Ticket).) According to Plaintiff, when Bisceglia gave Plaintiff the ticket, he told Plaintiff, "'Don't go back into the park until you go to court.'" (Pl.

Dep. A 211.)  Around the time of Plaintiff's first appearance in court, Plaintiff went to the City

Hall office of Defendant Ronald Belmont, the Commissioner of Recreation, who told Plaintiff

that he should not go back to the Park.[3]  (*Id.* 212-14.)

According to Belmont, Minishi had told him that Plaintiff "wanted to play ball with the

boys," that he "insisted on playing ball," and that he "wanted to jump in the game and play."

(Torczyner Decl. Ex. I (Dep. of Ronald Belmont ("Belmont Dep.") 37).)  Chiarella told Belmont

that Plaintiff "should not be allowed in the park" because "[a]n individual [who] acts this way

should not be allowed in the park," and Belmont agreed.  (*Id.* 49.)  Belmont decided to direct his

staff to exclude Plaintiff from the Park "[b]ecause he was arrested" for "inappropriate behavior."

(*Id.* 36.)  Belmont believed that he had the authority, as Superintendent of the Recreation

Department, to "give a directive," based on his own "judgement" [sic], to exclude an individual

from a public park in Harrison where Belmont perceived that there had been "actions by the

individual that would prohibit [him] from going into a park," such as "abusive" conduct.  (*Id.*

47.)

Plaintiff also sent a letter, dated May 7, 2003, to Defendant Stephen Malfitano, who was

then Mayor of Harrison, decrying the use of "race consciousness and force towards [Plaintiff]"

and "demand[ing] . . . that [Malfitano] pursue the swiftest measure to enforce [Plaintiff's]

constitutional guarantees and provide equal access and right a wrong that was perpetuated by

---

[3] At his deposition, Plaintiff first testified that Belmont gave him this instruction after his first court appearance (Pl. Dep. A 212), then testified that "it might have been before or after" (*id.*), and finally concluded that "it was before the first [court] appearance that [Plaintiff] went to see [Belmont], because his words to [Plaintiff] were . . . [that Plaintiff] should follow the police officer's instruction and . . . wait until [Plaintiff] go[es] to court" before returning to the Park (*id.* 214).

falsehood and myth." (Torczyner Decl. Ex. M (Pl. Letter, dated May 7, 2003).) According to

Malfitano, he received the letter on May 9, 2003, read it, referred it to Harrison's law

department, and discussed the situation with Belmont. (Torczyner Decl. Ex. L (Dep. of Stephen

Malfitano ("Malfitano Dep.") 9-10).) At his deposition, Malfitano testified that he was satisfied

with the Police and Recreation Departments' handling of the situation and did not personally

take any further action. (*Id.* 15.) He also testified that Belmont did have the authority to ban an

individual from the Park for misconduct. (*Id.* 18-19.)

On May 31, 2003, at 4:00 p.m., Plaintiff returned to the Park.[4] (Defs.' 56.1 ¶ 22.)

Plaintiff testified that he had once again been invited by Jaffe to watch his son's baseball game

and "to help him with his baseball skills." (Pl. Dep. B 215.) When Plaintiff arrived, he sat on

the bleachers. (Pl. Dep. A 217.) Minishi came over and introduced herself to Plaintiff, calling

him by name, and "advised [him] that [he] was not permitted to enter the park and asked [him] if

[he] would leave . . . before she has to call the authorities." (*Id.* 217, 219-20.) Plaintiff

responded to Minishi by saying "'certainly'" and proceeded to "walk[] back towards . . . the

recreational facility with her," so that he could "talk to her specifically about why [he] wasn't

---

[4] Plaintiff's memorandum in opposition to Defendants' motion identifies the date of
Plaintiff's return to the Park as May 30, 2003 (Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Pl.'s
Mem.") 2-6, 11-14), as does Plaintiff's Rule 56.1 statement (Pl.'s 56.1 ¶¶ 20, 28-29). However,
Plaintiff's papers do not cite any sources indicating that the date was May 30, Plaintiff himself
testified that the date was May 31 (Pl. Dep. A 214), and Plaintiff's Rule 56.1 statement
elsewhere admits that the date was May 31 (Pl.'s 56.1 ¶ 19); thus, the Court considers it
undisputed that the events following Plaintiff's return to the Park took place on May 31, 2003.
The Court also notes that it seems unlikely that a youth baseball game would have been
scheduled for the early afternoon of May 30, 2003, which was a Friday and, presumably, a
school day. (Pl. Dep. A 214 (noting that the games take place at "about the same time"); Pl.
Dep. B 215-16 (noting that Plaintiff was late for the game when he arrived at approximately 4:00
p.m.).)

allowed in the park," as Plaintiff "thought this whole incident [had been] resolved." (*Id.* 221.) According to Plaintiff, during this conversation Minishi denied that her request for Plaintiff to leave the Park was racially motivated, saying, "'I'm not doing this because you're black' . . . or something to that effect." (*Id.* 231.) At the end of Plaintiff's conversation with Minishi, Jaffe approached Plaintiff on his way out of the Park (*id.* 232), and Plaintiff and Jaffe walked toward "the far end of the park," which was near Plaintiff's house (Pl. Dep. B 234).

According to Minishi, Belmont had advised her that Plaintiff "was not allowed in the park anymore." (DeMatteo Decl. Ex. E (Dep. of Margaret Minishi ("Minishi Dep.") 15).) When Minishi saw Plaintiff sitting on the bleachers with Jaffe, she "called Mr. Belmont and told him and he told me to call the police department." (*Id.*)

Plaintiff testified that he and Jaffe exited the Park, walked up the hill toward Plaintiff's driveway, and were about to enter Plaintiff's yard when "a police officer came to the base of the hill and asked [Plaintiff and Jaffe] to come back down, and [they] politely said, 'No, we're not coming back down, that's too far a distance. You can come around if you want to talk to us,' because [Plaintiff and Jaffe] were already almost at the fence to get onto [Plaintiff's] driveway." (Pl. Dep. A 235.) As "the police officer was cooperative," Plaintiff and Jaffe continued to move up to Plaintiff's driveway, where they were then "detained" by the unidentified officer. (*Id.* 237.) The officer exited his vehicle and said that he had been "told that [Plaintiff] didn't belong in the park." (Pl. Dep. B 239.) He then asked Plaintiff and Jaffe "to stand up against the fence," approximately ten feet away from where they were standing at the time. (*Id.* 242-43.) After they went over to stand by the fence, the officer remained at the scene, and spoke on his phone for about one minute. (*Id.* 248-49.) Other police officers then arrived. (*Id.* 249.) The officer who

9

had originally stopped Plaintiff and Jaffe indicated that the officers "were trying to check out whether [Plaintiff] w[as] permitted in the park." (Pl. Dep. A 262.) The officers said "they had to call people and get it resolved." (*Id.* 263-64.)

Plaintiff testified that he and Jaffe remained in Plaintiff's driveway with the police officers for "probably . . . the better part of a half an hour," or approximately thirty minutes.[5] (Pl. Dep. B 249-50.) According to Plaintiff, "there was a lot of abuse from a lot of cops in that 30 minutes." (*Id.* 250.) Plaintiff testified that one of the officers said that he had been present at Plaintiff's previous eviction (*id.* 251), that Defendant Ralph Tancredi (a police officer, not in uniform, who had arrived in the driveway from the inside of his sister's garage next door) asserted that Plaintiff had not paid his rent (*id.*), that Tancredi told the other officers that Plaintiff had written a letter to Malfitano (Pl. Dep. A 253), that Tancredi told the other officers that Plaintiff had permitted his prior landlord to retain his security deposit (*id.* 255), and that another officer mocked Plaintiff for reportedly having given his previous landlord a security deposit totaling $10,800, which was the equivalent of three months' rent (*id.* 255-57). At some point, "a sergeant . . . who lives at the far end . . . of the housing development" arrived in his car and "told Tancredi that he should stand down, [though] not in those words, and leave us alone." (*Id.* 259.) After approximately thirty minutes, one of the officers told Plaintiff and Jaffe that they were free to go, and the officers left. (*Id.* 250, 261.) The officer said that they "got a call from the lieutenant, [who] went down to speak to Miss Minishi, [and] it's okay," or "something to that effect." (*Id.* 250, 261-62.) Plaintiff and Jaffe were told that "it was okay for [them] to go" and

---

[5] Plaintiff's Rule 56.1 submission notes that at a previous hearing Plaintiff had testified that he and Jaffe "were detained in [Plaintiff's] driveway for 'about an hour.'" (Pl.'s 56.1 ¶ 24.)

10

that "[t]hey had resolved the issue."  (*Id.* 262.)

Edward Arce, a Harrison police officer not named as a Defendant, testified that he interviewed Plaintiff, Minishi, and Belmont during Plaintiff's May 31 detention, that Minishi told him "that she had 'orders' from Belmont that [Plaintiff] was not allowed in the park," and that Minishi and Belmont told him that they did not wish to press charges against Plaintiff. (Defs.' 56.1 ¶¶ 37-39.)

### C.  June 2003 Incidents at Plaintiff's House

According to Plaintiff, on or about June 2, 2003 (Pl. Dep. B 336), Tancredi and Plaintiff had a conversation at Plaintiff's residence.[6]  (DeMatteo Decl. Ex. B (Trial Testimony of Neville Coward ("Pl. Trial Testimony") 204-05).)  Tancredi was there in order to serve court papers relating to a landlord-tenant dispute between Plaintiff and Tancredi's sister, Janet, who was Plaintiff's landlord.  (*Id.* 205, 209-10.)  When Tancredi knocked, Plaintiff opened the door and allowed Tancredi to enter his house.  (*Id.* 206.)  Plaintiff and Tancredi had a "cordial conversation" lasting at least fifteen minutes, Tancredi served Plaintiff with the court papers, and Tancredi exited Plaintiff's house.  (*Id.* 209-10, 212.)

Soon after, another unidentified police officer arrived at the door of Plaintiff's house. (Pl. Dep. B 336.)  Plaintiff spoke with the officer at the door for no more than two minutes.  (*Id.* 337.)  The officer said that Janet Tancredi had complained about Plaintiff using unspecified racial slurs.  (*Id.* 342; Pl. Trial Testimony 200-03.)  The officer said that Janet Tancredi had "filed a complaint of harassment" alleging that Plaintiff "had uttered racial slurs at her," and that

---

[6] Plaintiff's submissions assert that the date was in fact June 2, 2003 (Pl.'s 56.1 ¶ 35; Pl.'s Mem. 5, 13-14), but do not cite to any record evidence indicating that particular date.

11

the officer "doesn't want to hear none of [Plaintiff's] jailhouse bullshit."  (Pl. Trial Testimony

202-03, 212-13.)  The officer said to Plaintiff, "'You're going to go back in your house and

you're not going to say anything to this lady.'"  (*Id.* 200.)

Later that day, four or five unidentified police officers, including a lieutenant, entered

Plaintiff's house.  (Pl. Dep. B 349-50.)  Two entered first, and the others entered later.  (*Id.* 349.)

The officers said that they were "investigating the landlady's complaint."  (*Id.* 356.)  Plaintiff

was upset that the officers had "broke[n] in" and were in his house without his permission.  (*Id.*)

About five minutes after the officers arrived in Plaintiff's house, Plaintiff called his current

counsel and gave the phone to the officers, but the officers hung up the phone.  (Pl. Trial

Testimony 214-15; Pl. Dep. B 361-62.)  The officers asked Plaintiff to sit in the living room of

his house, and refused to leave the house despite Plaintiff asking them to do so.  (Pl. Trial

Testimony 215-16.)  Plaintiff called his attorney again, and his attorney "talked to the lieutenant

and asked them politely to leave [Plaintiff's] house," and then they left.  (*Id.* 216-17; Pl. Dep. B

361-62.)  The officers were in Plaintiff's house for about thirty minutes.  (Pl. Trial Testimony

217.)

### D.  Plaintiff's Criminal Trial

At some point a decision was made to supersede the criminal complaint against Plaintiff

in order to charge him with disorderly conduct rather than harassment.  (Bisceglia Dep. 44.)

According to Bisceglia, he was not involved in the decision, but "believe[d] somebody told

[him] that the DA's office suggested that we change it."  (*Id.* 45.)  Someone prepared a

"Violation Information" for Bisceglia to sign, which he did, on June 19, 2003.  (*Id.* 46.)  That

document stated:

[Plaintiff] . . . did with intent to cause public inconvenience, annoyance or alarm, recklessly created [sic] a risk by acting inappropriately by being disruptive and insulting towards 10-12 year old children around the ball field area of Silver Lake Park.  [Plaintiff] had been asked to leave by both a coach and the Recreation Supervisor but refused.  [Plaintiff] then insisted that he be allowed to play the baseball game with the children at the field.  [Plaintiff] then stood by the ball field bleachers crouched and repeatedly acted as if he was going to throw a baseball towards spectators and players.  [Bisceglia] then approached [Plaintiff] and asked him if he had been asked to leave.  [Plaintiff] answered that he had been asked to leave but did not have to because he was a resident of Harrison.  [Bisceglia] then told [Plaintiff] that several complaints were made about his conduct because his behavior had annoyed and alarmed the coaches and especially the children at the field.  [Plaintiff's] conduct in motioning as if he was going to throw the baseball at other persons while holding a baseball in his hand caused public convenience[,] annoyance and alarm[.]

(Torczyner Decl. Ex. O (June 19, 2003 Violation Information).)  The "coach" referred to in the Information was Chiarella.  (Bisceglia Dep. 49.)

The disorderly conduct charge against Plaintiff was tried before Town Judge John Voetsch on September 19 and October 3, 2003.  (Defs.' 56.1 ¶¶ 58-59; Torczyner Decl. Ex. P (Decision), at 1.)  At trial, Jaffe testified that while he was watching his sons' baseball game he did not hear Plaintiff use any profanity or "any insulting words," that he did not observe the children on his sons' team "becoming annoyed" by Plaintiff, that he did not observe anyone seeming "alarmed" by Plaintiff's behavior, and that he did not "feel threatened" by Plaintiff's exercises, as "it was very apparent that [Plaintiff] was going through a pitching motion."  (Jaffe Testimony 7-9, 12.)  On October 20, 2003, Judge Voetsch found Plaintiff not guilty of disorderly conduct, stating that "'although the alleged statements and actions of [Plaintiff] to the ball players, and others, were not appropriate and served no legitimate purpose and probably were offensive; said statements and actions do not amount to tumultuous or threatening behavior.'"  (Defs.' 56.1 ¶ 59.)

13

E.  Procedural History

On August 2, 2004, Plaintiff filed his initial Complaint against Bisceglia, Chiarella, Tancredi, Malfitano, Belmont, Minishi, and unnamed "John Doe" Defendants (together, the "Individual Defendants"), as well as Harrison and the Harrison Police and Recreation Departments.  The Complaint alleged eight claims, each of which was pleaded against "all Defendants."  First, Plaintiff alleged that the Defendants conspired to deprive Plaintiff of his constitutional rights, in violation of Section 1983.  (Compl. ¶¶ 46-51.)  Second, Plaintiff alleged that Defendants deprived Plaintiff of his constitutional rights, in violation of Section 1983, by subjecting Plaintiff to (a) defamation, (b) malicious prosecution, (c) false arrest on May 3, 2003, (d) denial of Plaintiff's "right as a United States citizen and as a resident of Harrison[] to make use of [the] Park," (e) false arrest "in front of [Plaintiff's] home," (f) unlawful entry into Plaintiff's home and "unlawful[] det[ention]" of Plaintiff, and (g) denial of equal protection of law.  (*Id.* ¶¶ 52-56.)  Third, Plaintiff alleged that Defendants subjected him to the "wrongful acts" delineated in his second cause of action because of Plaintiff's race, in violation of Section 1981.  (*Id.* ¶¶ 57-64.)  Fourth, Plaintiff alleged that Defendants discriminated against him on the basis of his race, in violation of Section 2000a.  (*Id.* ¶¶ 65-72.)  Plaintiff's fifth, sixth, seventh, and eighth causes of action alleged malicious prosecution, false arrest, intentional and negligent infliction of emotional distress, and prima facie tort, all in violation of state law.

Defendants moved to dismiss the Complaint for failure to state a claim.  In a Memorandum Decision and Order dated September 28, 2006, Judge Stephen C. Robinson, to whom this case was originally assigned, granted the motion in part and denied it in part.  Judge Robinson dismissed all claims against Harrison's Police Department and Recreation Department.

14

(Sept. 28, 2006 Order 4.)  He dismissed Plaintiff's Section 1983 conspiracy claim, his Section 1983 defamation claim, his Section 2000a claim, and his prima facie tort claim against all Defendants.  (*Id.* 6-7, 12-14.)  Judge Robinson also dismissed (a) Plaintiff's Section 1983 and state law claims of false arrest on May 3, 2003 and of malicious prosecution against all Individual Defendants except Bisceglia, Chiarella, and Minishi (*id.* 7-10); (b) Plaintiff's Section 1983 and state law claims of "false arrest" in front of Plaintiff's house against all Defendants except Tancredi and the John Does (*id.* 11); and (c) Plaintiff's Section 1983 unlawful entry claim against all Individual Defendants except the John Does (*id.* 11-12).

Plaintiff filed his Amended Complaint on January 30, 2007.  That pleading is virtually identical to the original Complaint, and fails to omit the defendants and claims previously dismissed by Judge Robinson.  However, the Amended Complaint does seek to rehabilitate Plaintiff's Section 2000a claim by seeking injunctive relief.[7]  (Am. Compl. ("AC") ¶ 72.)  The case was reassigned to this Court on September 18, 2007.  Plaintiff subsequently withdrew his claims of intentional and negligent infliction of emotional distress.

Defendants filed the instant motion for partial summary judgment on December 10, 2008.  Defendants assert that they are entitled to judgment as a matter of law dismissing (a) Plaintiff's Section 1983 and state law false arrest claims against Bisceglia, Chiarella, and Minishi (Defs.' Mem. in Supp. of Mot. for Partial Summ. J. ("Defs.' Mem.") 6-9), (b) Plaintiff's Section 1983 claim against Tancredi and the John Does for unreasonable detention in front of Plaintiff's house (*id.* 9-11), (c) Plaintiff's Section 1983 claim against the John Does for unlawful entry into

---

[7] Judge Robinson had dismissed Plaintiff's original Section 2000a claim for failure to seek injunctive relief, which is the only remedy available under that statute.  (Sept. 28, 2006 Order 13.)

Plaintiff's house (*id.* 11-12), (d) Plaintiff's Section 1983 claim against all Defendants for

wrongful exclusion from the Park (*id.* 12-15), (e) Plaintiff's Section 1981, Section 2000a, and

equal protection Section 1983 claims,[8] other than his claims for racially discriminatory malicious

prosecution, against all Defendants (*id.* 16-17), and (f) all of Plaintiff's remaining Section 1983

claims against Harrison (*id.* 17-21).  Defendants do not seek summary judgment as to any of

Plaintiff's claims arising from his alleged malicious prosecution.  (*Id.* 2 n.1.)

 Oral argument was held on September 24, 2009.

## II.  Discussion

### A.  Standard of Review

 Summary judgment may be granted when it is shown that there is "no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "When ruling on a summary

judgment motion, the district court must construe the facts in the light most favorable to the non-

moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

A party seeking summary judgment bears the burden of establishing that no genuine issue of

material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.

2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

---

 [8] Defendants do not specifically address Plaintiff's Section 1983 equal protection claim, but it is fair to read Defendants' contention that Plaintiff "cannot present any evidence that race was a factor in his arrest and subsequent exclusion from the park" (Defs.' Mem. 16) as an argument for dismissal of that claim.

element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

B.  Fourth Amendment and Related State Law Claims

Plaintiff alleges that Bisceglia, Chiarella, and Minishi "caus[ed] Plaintiff to be falsely arrested and wrongfully detained on May 3, 2003," that Tancredi and the John Does "caus[ed] Plaintiff to be wrongly detained, interrogated and publicly humiliated in front of his home" on May 31, 2003, and that the John Does "unlawfully detain[ed] Plaintiff" in his house on or about June 2, 2003, all in violation of Plaintiff's Fourth Amendment right to be "free[] from unreasonable search and seizure" and state law.  (AC ¶¶ 53, 83-87.)  Defendants contend that there is no genuine issue of material fact as to the existence of probable cause to arrest Plaintiff on May 3, 2003, or as to the legality of the detention of Plaintiff in front of his house on May 31, 2003, and that Plaintiff's failure to identify the John Does at this stage in the litigation negates any claim based on their alleged misconduct.  (Defs.' Mem. 5-12.)

1.  May 3, 2003 Arrest

Defendants' motion papers assert that Bisceglia, Chiarella, and Minishi are entitled to summary judgment on Plaintiff's claim of false arrest on May 3, 2003, on grounds of collateral

17

estoppel; they claim that comments made by Judge Voetsch in finding Plaintiff not guilty of

disorderly conduct establish that there was probable cause to arrest Plaintiff for harassment.

(Defs.' Mem. 7-9.)  At oral argument, Defendants' counsel withdrew this argument.[9]  As

_____

[9] As Defendants acknowledged at oral argument, collateral estoppel does not bar
Plaintiff's Section 1983 claim of false arrest on May 3, 2003.

"[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain
free from unreasonable seizures, which includes the right to remain free from arrest absent
probable cause."  *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Espada v.
Schneider*, 522 F. Supp. 2d 544, 551 (S.D.N.Y. 2007).  "In analyzing claims alleging the
constitutional tort of false arrest, '[the Second Circuit] ha[s] generally looked to the law of the
state in which the arrest occurred.'"  *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir.
2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)); *see also Rheingold v.
Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 389 (S.D.N.Y. 2008) ("A claim for false
arrest, resting on the Fourth Amendment right to be free from unreasonable seizures, is
substantially the same as a claim for false arrest under New York law." (internal quotation marks
omitted)).

"Under New York law, the elements of a false imprisonment [or false arrest] claim are:
(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the
confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was
not otherwise privileged."  *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (first and
second alterations in original); *see also Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)
(same, discussing false imprisonment).  "Under New York law, the existence of probable cause
is an absolute defense to a false arrest claim."  *Jaegly*, 439 F.3d at 152.  "An officer has probable
cause to arrest when [the officer] has 'knowledge or reasonably trustworthy information of facts
and circumstances that are sufficient to warrant a person of reasonable caution in the belief that
the person to be arrested has committed or is committing a crime.'"  *Id.* (quoting *Weyant v. Okst*,
101 F.3d 845, 852 (2d Cir. 1996)).

"Under New York law, collateral estoppel will preclude a federal court from deciding an
issue if (1) the issue in question was actually and necessarily decided in a prior proceeding, and
(2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the
issue in the first proceeding."  *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007) (internal
quotation marks omitted).

Assuming *arguendo* that Judge Voetsch's comments about Plaintiff's conduct on May 3,
2003 amounted to a finding of probable cause to arrest Plaintiff for harassment, such a finding
has no collateral estoppel effect here.  As Plaintiff notes, whether there was probable cause to
arrest Plaintiff for harassment "was not an issue that had to be 'necessarily' decided at Plaintiff's
criminal trial."  (Pl.'s Mem. 9.)  Plaintiff was on trial for disorderly conduct, and the only issue
that was necessarily decided at the trial — whether Plaintiff was guilty of disorderly conduct —
was decided in his favor.  Any comment Judge Voetsch may have made about probable cause to
arrest Plaintiff was unnecessary to his conclusion that the prosecution failed to prove Plaintiff

Defendants have not advanced any other argument for summary judgment as to Plaintiff's Section 1983 and state law false arrest claims based on Plaintiff's May 3, 2003 arrest, summary judgment is denied as to those claims against Bisceglia, Chiarella, and Minishi.

2.  May 31, 2003 Detention in Front of Plaintiff's Home

Defendants argue that Tancredi and the John Does are entitled to summary judgment as to Plaintiff's claims based on his detention in front of his home on May 31, 2003, on the grounds that there is no genuine issue of material fact as to the officers' probable cause to detain Plaintiff, or as to whether the detention was unreasonable at its inception or lasted any longer than necessary to complete the investigation of Plaintiff.  (Defs.' Mem. 9-10; Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Reply Mem.") 4.)  In addition, Defendants assert that Tancredi is entitled to summary judgment because there is no genuine issue of material fact as to Tancredi's personal involvement in the detention.  (Defs.' Mem. 10-11.)

"Beginning with *Terry v. Ohio*, 392 U.S. 1 [(1968)], the [Supreme] Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further."  *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt County*, 542 U.S. 177, 185 (2004).  "To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited.  The officer's action must be justified at its inception, and . . . reasonably related

---

guilty beyond a reasonable doubt, and Plaintiff's acquittal denied him a full and fair opportunity to litigate the issue of probable cause in his criminal proceeding.  *See Johnson v. Watkins*, 101 F.3d 792, 796 (2d Cir. 1996) (applying New York law and holding that Section 1983 plaintiff's "acquittal precluded the district court from giving collateral estoppel effect to determinations made at the suppression hearing earlier in the criminal proceedings," because plaintiff "had neither the opportunity nor the incentive to appeal the adverse finding of probable cause to arrest him").

in scope to the circumstances which justified the interference in the first place." *Id.* (internal quotation marks omitted). "For example, the seizure can not continue for an excessive period of time, or resemble a traditional arrest." *Id.* at 185-86 (internal citations omitted); *see also Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." (internal quotation marks omitted)). "In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). An "investigative stop that exceeds [the] time required to confirm or dispel suspicion with reasonable diligence becomes [a] *de facto* arrest," and such "continued detention without probable cause violate[s] the Fourth Amendment." *Gilles*, 511 F.3d at 246; *see also id.* at 245 ("If police officers restrain an individual in a manner that, though not technically an arrest, is nonetheless so intrusive as to be tantamount to an arrest, probable cause is also required." (internal quotation marks omitted)). "At what point a[n] . . . investigative detention ripens into an arrest is a question of fact . . . ." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995).

Plaintiff asserts that the John Does lacked reasonable suspicion that Plaintiff was engaged in criminal conduct on May 31, 2003. First, Plaintiff contends that he was told that "he could return to the Park once he made his first court appearance," and that because he had appeared in court in mid-May, he believed he was permitted to enter the Park on May 31. (Pl.'s Mem. 12.)

20

Second, Plaintiff argues that because of the "significant dispute as to whether there was probable cause to take any action against Plaintiff on May 3, 2003, there is a significant issue as to whether excluding Plaintiff from the park . . . was valid and legal" in the first place (*id.*); if Plaintiff's presence in the Park was lawful, there could be no reasonable suspicion that he was committing a crime.

Plaintiff has failed to adduce evidence establishing a genuine issue of material fact as to the John Does' reasonable suspicion that Plaintiff was engaging in criminal conduct by his presence in the Park. Plaintiff testified that between May 3 and May 31, 2003, he was told by Belmont and by Bisceglia not to go back to the Park, and that Bisceglia told him on May 3 not to go back to the Park "'until you go to court.'" (Pl. Dep. B 210-11.) Plaintiff also testified that while he was in the Park on May 31, Minishi told him that he was not permitted to be in the Park and that she would call "the authorities" if he did not leave. (Pl. Dep. A 219-20.) There is therefore no question that the John Does who detained Plaintiff on May 31 were justified in believing that there was reason to detain him — i.e., in believing that he may have been illegally present in the Park — and there is no evidence in the record that they did not believe that to be the case. Indeed, the evidence is that during Plaintiff's detention, the John Does indicated to Plaintiff that "they were trying to check out whether [Plaintiff] w[as] permitted in the park," that they said "they had to call people and get it resolved," that they spoke to Minishi about the issue, and that they said "it was okay for [Plaintiff] to go" when they "had resolved the issue." (*Id.* 261-64.) The factual dispute over whether Plaintiff had in fact been authorized to return to the Park following his mid-May court appearance is not dispositive of whether the John Does had a reasonable suspicion that he had *not* been so authorized; on that latter issue, there is no evidence

from which a reasonable jury could conclude that the John Does would have definitively known of that authorization and thus lacked reasonable suspicion sufficient to detain Plaintiff.

Plaintiff also argues, however, that because he has "adduced evidence demonstrating a prolonged, intrusive and humiliating detention," there is a genuine issue of material fact as to whether the detention was constitutionally reasonable in scope.  (Pl.'s Mem. 13.)  Defendants assert that Plaintiff "has presented no testimony which would rebut the showing that he was only detained long enough for the officers to speak with Minishi and ascertain that . . . Minishi did not want to press charges against him" (Defs.' Reply Mem. 4), and that, in the alternative, assuming that the detention was unreasonable in scope and thus tantamount to an actual arrest, the John Does had probable cause to arrest Plaintiff (Defs.' Mem. 10).

The record evidence as to the reasonableness of the scope of Plaintiff's detention is that Plaintiff was detained for approximately thirty minutes, that during the detention he remained in the driveway of his own home, that the police spent that time making inquiries as to whether Plaintiff was permitted to be in the Park, and that Plaintiff was permitted to leave promptly after it was confirmed that no one wished to press charges against Plaintiff.  These circumstances suggest that the detention did not ripen into an actual arrest.  *See Gilles*, 511 F.3d at 244 n.3 (noting that investigative detention for "approximately thirty minutes" was supported by reasonable suspicion until police determined that the stopped vehicle had not been stolen, that the driver had a valid license, and that the vehicle contained no explosives or contraband); *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) ("conclud[ing] that [defendant's] seizure did not equate to a *de facto* arrest under the Fourth Amendment," and noting that "because the stop occurred at [defendant's] residence, he was subjected to neither the

inconvenience nor the indignity associated with a compelled visit to the police station" (internal quotation marks omitted)); *United States v. Gori*, 230 F.3d 44, 57 (2d Cir. 2000) (upholding detention without probable cause where the officer's "questions served the purpose of readily confirming or dispelling a reasonable suspicion, involved no more intrusion than necessary to accomplish the purposes of his investigation, and thereby fit comfortably within the limits authorized by *Terry*"); *Tehrani*, 49 F.3d at 61 (upholding detention lasting approximately thirty minutes in case of reasonable suspicion of illegal border crossing where "no force was required and none was used," where border patrol agent "proceeded to make diligent telephone inquiries about the detainees' immigration status immediately after their detention," and where detainee "does not suggest how the border patrol agent could have ascertained his status any more quickly").

On the other hand, in support of Plaintiff's view that the scope of his detention was unreasonable, he offers his deposition testimony that "there was a lot of abuse from a lot of cops in that 30 minutes."  (Pl. Dep. B 250.)  The evidence of this "abuse" consisted of Plaintiff's testimony that one of the officers said that he had been present at Plaintiff's previous eviction (*id.* 251), that Tancredi asserted that Plaintiff had not paid his rent (*id.*), that Tancredi told the other officers that Plaintiff had written a letter to Malfitano (Pl. Dep. A 252-53), that Tancredi told the other officers that Plaintiff had permitted his prior landlord to retain his security deposit (*id.* 255), and that another John Doe officer mocked Plaintiff for having given that landlord a security deposit totaling $10,800 (*id.* 255-57).  Although Plaintiff neither asserts that the officers asked him any invasive questions about these personal matters nor explains how the comments would have had the effect of prolonging the detention, and the Court has not found any authority

suggesting that officers' allegedly impolite comments regarding a detainee's personal affairs can independently render an investigative detention unreasonable in scope, the record evidence is that several police officers were involved in the detention and that the threat posed by Plaintiff at the time of his detention was apparently quite low (as he had already left the Park when he was stopped).[10]  These facts weigh against summary judgment.  *See Newton*, 369 F.3d at 674 ("Among the facts generally deemed relevant [in determining reasonableness of a *Terry* stop] are (1) the length of time involved in the stop; (2) its public or private setting; (3) *the number of participating law enforcement officers*; (4) *the risk of danger presented by the person stopped*; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons." (emphases added)).

However, the Court need not decide whether there is a genuine issue of material fact bearing on whether Plaintiff's detention was justified by reasonable suspicion at its inception and was reasonable in its scope — i.e., on whether it was a reasonable investigative detention and not a de facto arrest — because Tancredi and the John Does are entitled to summary judgment as to Plaintiff's Section 1983 Fourth Amendment claim on other grounds.  The John Doe Defendants are entitled to summary judgment on the grounds explained below, *see infra* Section II.B.3 — i.e., that Plaintiff had ample time to identify them but has failed to do so or to demonstrate why he has been unable to do so in the five years since he initiated this lawsuit.  Tancredi is entitled to summary judgment on grounds that Plaintiff has adduced no evidence that he was personally

---

[10] Moreover, on the issue of the risk of danger potentially posed by Plaintiff, Defendants have pointed to no evidence in the record indicating that disobeying Belmont's order to stay out of the Park would have actually been a crime (though at oral argument they asserted that Plaintiff was suspected of trespassing in violation of New York state law).

involved in the putatively unconstitutional detention, notwithstanding Plaintiff's assertion that "it appeared that Tancredi's involvement in [Plaintiff's] detention served to prolong it" (Pl.'s Mem. 13). Plaintiff's testimony is that Tancredi was not in uniform and arrived on the scene after Plaintiff had already been detained, and does not indicate that Tancredi gave any directions to Plaintiff (unlike, for example, the unidentified officer who allegedly told Plaintiff to "stand up against the fence"), or that Tancredi directed the other officers as to whether Plaintiff should continue to be detained. *See Merritt v. City of New York*, No. 97-CV-4929, 2001 WL 1097866, at *2 (S.D.N.Y. Sept. 19, 2001) (holding that plaintiff could not assert a false arrest claim against an officer who "did not arrive until well after the initial arrest had taken place"); *cf. Hickey v. City of New York*, No. 01-CV-6506, 2002 WL 1974058 (S.D.N.Y. Aug. 26, 2002) (denying motion to dismiss but noting that a mere showing that defendants "came to the station house after [plaintiff] had already been detained and asked her questions" would not be enough to hold defendants liable for false arrest).[11] Accordingly, Tancredi and the John Does are entitled to

---

[11] At oral argument, Plaintiff argued that he should be also permitted to proceed with a Section 1983 false arrest claim against Minishi based on the May 31, 2003 detention. However, Plaintiff's memorandum in opposition to Defendants' motion did not mention Minishi in connection with his arguments about this detention (Pl.'s Mem. 11-13), and Judge Robinson made clear in his September 28, 2006 Memorandum Decision and Order that he did not consider Plaintiff to have stated a claim of personal involvement in this detention against any Individual Defendant other than Tancredi and the John Does, and denied Defendant's motion to dismiss only as to Tancredi and the John Does (Sept. 28, 2006 Order 9, 11). Nevertheless, even assuming that Plaintiff's claim against Minishi as to the May 31 detention were still viable after the motion to dismiss stage, the Court notes that it could not survive summary judgment. The uncontradicted evidence as to Minishi's decision to call the police is Minishi's testimony that Belmont had told her that Plaintiff was not allowed in the Park and that, when she informed Belmont on May 31, 2003 that Plaintiff was in the Park, Belmont told her to call the police. Plainly, it was not unreasonable for Minishi to follow her boss's orders and call the police. And even assuming arguendo that the scope of the detention was unreasonable, there is no evidence in the record that Minishi directed the police officers to detain Plaintiff in such a manner (or even to detain him at all). *See Carmellino v. Dist. 20 of N.Y. City Dep't of Educ.*, No. 03-CV-

summary judgment as to Plaintiff's Fourth Amendment claim based on the May 31 detention.[12]

### 3.  June 2003 Entry

Defendants argue that the John Does are entitled to summary judgment as to Plaintiff's

claims based on the officers' alleged entry into Plaintiff's home on or about June 2, 2003, on

grounds that Plaintiff has thus far failed to identify the John Does.  (Defs.' Mem. 11-12.)  In

response, Plaintiff contends that summary judgment is inappropriate because Defendants have

not met their discovery obligations to assist Plaintiff in identifying the officers.[13]  (Pl.'s Mem.

---

5942, 2006 WL 2583019, at *61 (S.D.N.Y. Sept. 6, 2006) ("[A] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest . . . ." (internal quotation marks omitted)).

[12] As for Plaintiff's state law false arrest claim based on the May 31, 2003 detention, the John Does are also entitled to summary judgment for the reasons described below, *see infra* Section II.B.3, and Tancredi is entitled to summary judgment on grounds that Plaintiff has adduced no evidence that Tancredi actually confined Plaintiff (Defs.' Mem. 10-11).  As for Plaintiff's claim that Harrison should be held vicariously liable for false arrest by the John Does, Defendants' sole argument for summary judgment is that there was probable cause to detain Plaintiff, and that therefore his confinement was privileged.  (*Id.* 9-10.)  However, there is a genuine issue of fact as to whether Plaintiff's exclusion from the Park was still in effect as of May 31, 2003, and as noted above, Defendants have pointed to no evidence in the record indicating that disobeying Belmont's order to stay out of the Park (were the order still in effect) would have actually been a crime.  Thus, Defendants have not established Harrison's entitlement to summary judgment as to Plaintiff's state law false arrest claim.

[13] Plaintiff also states that he opposes "dismissal of any claims pertaining to the June 2, 2003 incident with respect to Defendant Tancredi."  (Pl.'s Mem. 14.)  However, Judge Robinson's September 28, 2006 Memorandum Decision and Order mentioned only the John Does in permitting Plaintiff's "unlawful entry" claim to go forward.  (Sept. 28, 2006 Order 11-12.)  Plaintiff nonetheless asserts:  "Based on the facts adduced with respect to both the May [31], 2003 incident, and Tancredi's contacts with Plaintiff on the morning of June 2, 2003, there is a strong inference to be drawn that Tancredi was involved in the June 2, 2003 incident."  (Pl.'s Mem. 14.)  In any event, the Amended Complaint does not allege that Tancredi unlawfully entered Plaintiff's home on June 2, 2003, and there is *no* evidence in the record that Tancredi was among the police officers who did so, or that Tancredi directed the John Doe officers to enter Plaintiff's residence.  What Plaintiff terms a "strong inference" is merely conjecture, and any unlawful entry claim against Tancredi — assuming that it survived Judge Robinson's

13-14.)

"Using 'Doe' in place of specifically naming a defendant does not serve to sufficiently identify the defendant." *Kearse v. Lincoln Hosp.*, No. 07-CV-4730, 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009) (internal quotation marks omitted).  However, "[c]ourts typically resist dismissing suits against John Doe defendants 'until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials.'"  *Id.* (quoting *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998)); *see also Warren v. Goord*, 476 F. Supp. 2d 407, 413-14 (S.D.N.Y. 2007) ("[T]he Court will not dismiss the claim against John Doe until plaintiff has had sufficient discovery to name the defendant.").

Where a plaintiff "has had ample time to identify" a John Doe defendant but gives "no indication that he has made any effort to discover the [defendant's] name," however, the plaintiff "simply cannot continue to maintain a suit against" the John Doe defendant.  *Kearse*, 2009 WL 1706554, at *3; *see also Keesh v. Artuz*, No. 97-CV-8417, 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) ("Even after discovery, plaintiff has failed to identify the 'John Doe' and 'Jane Doe' defendants.  Accordingly, the complaint against them must be dismissed."); *Blake v. Race*, 487 F. Supp. 2d 187, 192 n.1 (E.D.N.Y. 2007) (dismissing without prejudice claims against "John Doe" defendants "because plaintiff [had] an opportunity to pursue discovery to identify the unknown defendants but failed to do so" (internal quotation marks omitted) (alteration in original)); *Watkins v. Doe*, No. 04-CV-0138, 2006 WL 648022, at *3 (S.D.N.Y. Mar. 14, 2006) (dismissing without prejudice claims against "John Doe" defendants where "despite having the

_____

September 28, 2006 order — is dismissed.  *See ITC Ltd. v. Punchgini, Inc.*, 518 F.3d 159, 163 (2d Cir. 2008) ("Conjecture, of course, is insufficient to withstand summary judgment.").

full opportunity to conduct discovery, plaintiff has not yet identified and served [those]

defendants . . . within 120 days of filing the complaint . . . [and] has not sought an extension of

the time allowed").

Under Rule 56(f) of the Federal Rules of Civil Procedure, "[i]f a party opposing [a

summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts

essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to

enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order."  Fed. R. Civ. P. 56(f).  "To oppose a motion on the basis of Rule

56(f), a party must file an affidavit detailing: (1) what facts are sought and how they are to be

obtained; (2) how these facts are reasonably expected to create a genuine issue of material fact;

(3) what efforts the affiant has made to obtain those facts; and (4) why these efforts were

unsuccessful." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 606 (2d Cir. 2005).

In this case, Plaintiff filed his opposition to the instant motion along with a "Declaration

Pursuant to Fed. R. Civ. P. 56(f)."  That Declaration, signed by Plaintiff's counsel and dated

November 12, 2008, asserts that there are "items of discovery outstanding," including

"photographs of the officers who were employed by the Harrison Police Department in May and

June of 2003."  (Decl. Pursuant to Fed. R. Civ. P. 56(f) ("Pl.'s 56(f)") ¶¶ 2, 4.)  According to

Plaintiff's counsel, these photographs are needed "for the purpose of identifying the officers who

unlawfully entered Plaintiff's apartment," Defendants have "failed to produce these items despite

promises to do so and the direction of the Court," and "summary judgment should not be granted

. . . until Defendants produce the items in question."  (*Id.* ¶¶ 4-5.)

Defendants assert, in response, that despite the Court's direction to serve a written

28

demand for the photographs, Plaintiff has never done so.  (Defs.' Reply Mem. 5; Torczyner

Reply Decl. ¶ 8 ("On May 20, 2008, . . . [t]he Court . . . asked the Plaintiff whether written

demands [for photographs] had been served and the Plaintiff answered in the negative."); *id.* ¶ 9

("The Court then directed the Plaintiff to serve written demands . . . ."); *id.* ¶ 11 ("The

Defendants did not receive any written discovery demands . . . following the . . . conference on

May 20, 2008.").  At oral argument, Plaintiff's counsel conceded that, to date, no written

demands for photographs have been served.  Moreover, Plaintiff's counsel co-signed a letter to

the Court, dated October 25, 2007, stating that "the parties have completed all documentary

discovery, as responses to all interrogatories and document demands have been served."  (Joint

Status Report, dated Oct. 25, 2007, at 2.)  And Plaintiff never filed a motion to compel, based on

Defendants' refusal to produce, the photographs of Harrison police officers.

Plaintiff named John Does as defendants when filing this lawsuit in August 2004.  The

Amended Complaint was filed in January 2007, and Plaintiff represented to the Court that

documentary discovery was complete in October 2007.  Magistrate Judge George A. Yanthis

declared all discovery complete in March 2008 (without apparent objection from Plaintiff), and

the instant motion was filed in December 2008.  Five years have now elapsed since Plaintiff

brought his initial claims against the John Does.  Plaintiff has had ample opportunity to make

written demands for photographs or other information that might allow him to identify the John

Does.  Plaintiff's Rule 56(f) submission fails to excuse his failure to do so, as it does not explain

what efforts Plaintiff has made to obtain the identities of the John Does or why his efforts were

unsuccessful.  Plaintiff's unlawful entry claims against the John Does — and all other claims

against the John Does not otherwise dismissed with prejudice — are therefore dismissed without

prejudice.[14]

C.  Fourteenth Amendment Due Process Claim

Plaintiff asserts a Section 1983 claim against all Defendants for "knowingly and willfully

denying to Plaintiff his right as a United States citizen and as a resident of Harrison[] to make

use of [the] Park."  (AC ¶ 53.)  The Amended Complaint does not specify the legal basis for this

claim, and Judge Robinson did not address it in his September 28, 2006 order.  In their motion

papers, however, Defendants construe the claim as asserting that Defendants violated Plaintiff's

rights guaranteed by the Due Process Clause of the Fourteenth Amendment, and Defendants

argue that they are entitled to summary judgment on grounds that access to a public park is

neither a fundamental right nor a cognizable liberty interest that could be protected by the Due

Process Clause.  (Defs.' Mem. 13-14.)  Plaintiff responds by characterizing his claim instead as

asserting "a violation of fundamental rights including equal protection and the rights addressed

by, *inter alia*, 42 U.S.C. §§ 1981 and 2000a."  (Pl.'s Mem. 20.)  Although Plaintiff uses the term

"fundamental rights," he essentially acknowledges that his constitutional claims relating to

Plaintiff's exclusion from the Park sound in equal protection, not in due process:  "[W]hile . . .

the mere exclusion f[ro]m a public place might not . . . represent the violation of a fundamental

right, there can be no doubt that an exclusion from a public place that arises from racial

discrimination is violative of such rights . . . ."  (*Id.* 20-21.)  *See Williams v. Town of*

_____

[14] Even if Plaintiff had obtained the photographs after Defendants filed this motion and identified the John Doe officers, there would still be a serious question as to whether any claims against those officers would be timely.  *See Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995) ("[Federal] Rule [of Civil Procedure] 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities.").

*Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) ("Because . . . a municipality's decision to limit access to its facilities does not interfere with the right to free movement, . . . [plaintiff's] expulsion and temporary exclusion from [a municipal community] [c]enter did not deprive him of a liberty interest protected by the Due Process Clause of the Fourteenth Amendment."). Accordingly, any putative due process claim has been abandoned by Plaintiff, and is therefore dismissed.

D.  Fourteenth Amendment Equal Protection Claim Against Individual Defendants

Plaintiff asserts a Section 1983 claim against all Defendants for "knowingly and willfully denying Plaintiff equal protection of law." (AC ¶ 53.) As elaborated under the heading of Plaintiff's Section 1981 claim, Plaintiff alleges that "[t]he wrongful acts described [in the Amended Complaint] were purposefully discriminatory and motivated and instigated by racial animus against people of African-American origin." (*Id.* ¶ 58.) Defendants, in addressing the Section 1981 claim, argue that they are entitled to summary judgment because Plaintiff "cannot point to any racial animus which led to the events which occurred." (Defs.' Mem. 17.)

"[T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race . . . ." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (internal quotation marks omitted). "[R]acial discrimination under the Equal Protection Clause requires a racially discriminatory purpose . . . ." *Howard v. Senkowski*, 986 F.2d 24, 26 (2d Cir. 1993) (internal quotation marks omitted). "[T]he test is whether a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 27 (internal quotation marks omitted). "When the issue is . . . whether or not an impermissible consideration

31

motivated the challenged action, . . . pretext analysis employs the familiar three-step approach [of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)]." *Id.*; *see also id.* at 27 n.2 ("Though pretext analysis was developed in Title VII cases, such as . . . *McDonnell Douglas*, it is fully applicable to constitutional claims where the issue is whether an improper motive existed . . . .").

Thus, "the claimant must present a *prima facie* case sufficient to establish an inference of improper motivation; the party accused of discrimination must then articulate race-neutral reasons for the challenged action; the claimant then bears the ultimate burden of persuasion to show that the articulated reasons are pretextual and that the 'real' reason is the impermissible one." *Id.* at 25.

In presenting a prima facie case of discrimination, "a plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001). However, "a plaintiff alleging a claim of selective *prosecution* in violation of the Equal Protection Clause must plead and establish the existence of similarly situated individuals who were not prosecuted; that is because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute." *Id.* at 109.

Plaintiff has adduced evidence establishing a genuine issue of material fact as to whether his May 3, 2003 arrest and subsequent prosecution were racially motivated, in violation of Plaintiff's equal protection rights. Plaintiff's and Jaffe's testimony is that, on May 3, 2003,

Plaintiff's exercises near the baseball field were not alarming to anyone, and that although

Plaintiff may have been the only adult calling out comments to the baseball players at the time,

his comments were neither harassing nor different from the comments frequently called out by

certain parents who "yell out encouragement and critiques" during their children's baseball

games.  According to Plaintiff, he was the only African-American in the Park at the time of his

arrest; the only other "dark-skinned" people in the vicinity were a woman and her small child,

who were on a different field in the Park, and whom Plaintiff "wouldn't classify . . . as African

American."  (Pl. Dep. A 386-88.)  Plaintiff's and Jaffe's account, if credited, would at least raise

an inference of discriminatory treatment of Plaintiff on the basis of his race.  In turn, Defendants

have provided race-neutral explanations for their actions, i.e., by describing Plaintiff's allegedly

alarming activities and harassing comments and reports thereof, without any suggestion that they

treated Plaintiff differently from any other similarly situated individual.

At the final step of the burden-shifting test, there is enough evidence for a reasonable jury

to find that race was a motivating factor behind Bisceglia, Chiarella, and Minishi's actions.

While Plaintiff has adduced no evidence that any specific individual of a different race was

similarly situated to Plaintiff on May 3, 2003, he has pointed to testimony in the record

supporting the inference that it was not uncommon for white parents to shout out similar

comments in similar situations without incident.  Plaintiff has also identified discrepancies in

Defendants' accounts of Plaintiff's behavior and their reasons for taking action against him.  For

instance, Bisceglia's May 3, 2003 criminal complaint asserts that Plaintiff "insist[ed]" on playing

baseball with the children, yet Chiarella testified that Plaintiff had not been insistent and that

Chiarella had never made this accusation to Bisceglia.  And despite the statement in the criminal

complaint that Plaintiff was "asked by both coaches and the Harrison Recreation supervisor to stop . . . his irrational and alarming behavior," the admissible record evidence before the Court does not disclose that anyone, prior to Plaintiff's arrest, asked him to stop doing anything.[15] Thus, the Court cannot conclude as a matter of law that Bisceglia, Chiarella, or Minishi is entitled to judgment on Plaintiff's equal protection claim.

All other Individual Defendants are entitled to summary judgment as to Plaintiff's Section 1983 equal protection claims on grounds that there is no evidence that they were personally involved in any potentially racially discriminatory action against Plaintiff. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)). The evidence as to Tancredi is that he was only present during Plaintiff's detention on May 31, 2003, and that he made rude statements about Plaintiff with respect to Plaintiff's landlord-tenant dispute with Tancredi's sister, but there is no evidence suggesting that anything Tancredi did was racially motivated.

---

[15] The Court notes in particular that the brief portion of Minishi's deposition testimony excerpted by Plaintiff does little to clarify what happened on May 3, 2003, and Defendants do not add to it in their own exhibits. Nowhere does it appear that Minishi confirmed or denied Chiarella's account that Minishi told him that "she had a problem with [Plaintiff]," namely, "that he was standing by the main baseball field where the game was going on and critiquing the kids playing, telling them they were no good and telling them other things." (Defs.' Chiarella Dep. 20.) Nor does Minishi address whether she had told Plaintiff to leave, as Chiarella testified and as Bisceglia testified was reported to him by Chiarella. (Pl.'s Chiarella Dep. 30; Bisceglia Dep. 49.) Nor does Minishi say whether she told Belmont that Plaintiff "insisted on playing ball" with the children and "wanted to jump in the game and play." (Belmont Dep. 37.) Defendants thus are left largely with inadmissible hearsay (or double-hearsay) statements in support of their motion, and the Court cannot give weight to such statements in determining whether a genuine issue of material fact exists. *See Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) ("[H]earsay [statements are] not proper for this Court to consider on a motion for summary judgment.").

Nor can Plaintiff's Section 1983 claims against Belmont be maintained.  Plaintiff argues, in connection with his claim of racially discriminatory exclusion from the Park, that an inference that Belmont's decision to exclude him was racially motivated could be drawn from an inconsistency between Belmont and Chiarella's accounts; according to Plaintiff, while Belmont "argues that his conduct was based upon advice from police that Plaintiff had 'acted inappropriately' with children in the park," Chiarella "flatly denies ever having had such a conversation with Belmont."  (Pl.'s Mem. 22.)  Plaintiff's characterization of the record is inaccurate.  Chiarella testified that he spoke with Belmont about his May 3, 2003 encounter with Plaintiff and merely could not recall whether he had told Belmont that he believed Plaintiff should be excluded from the Park.  (Pl.'s Chiarella Dep. 39-40.)  In any event, there is no evidence in the record from which a reasonable jury could conclude that Belmont's decision to exclude Plaintiff from the Park was motivated by racial discrimination.  At oral argument Plaintiff was unable to direct the Court to any evidence that Belmont even knew of Plaintiff's race at the time that he made the decision to exclude Plaintiff from the Park.[16]  *See McDowell v. T-Mobile USA, Inc.*, 307 F. App'x 531, 533 (2d Cir. Jan. 21, 2009) (summ. order) (affirming summary judgment where plaintiff "failed to come forward with any evidence that [supervisor] knew plaintiff's race"); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 81 (2d Cir. 2005) (noting, in age discrimination context, that a plaintiff cannot make out a prima facie case "[w]ithout some evidence that an employer knew that it was replacing an older worker with a younger one").  Nor is there any evidence suggesting that Belmont would have had reason to know that Bisceglia's,

---

[16] At oral argument, the Court invited Plaintiff's counsel to supplement the record with any such evidence, but counsel provided none.

Chiarella's, or Minishi's actions in bringing about Plaintiff's May 3, 2003 arrest were motivated by racial animus, or that Belmont would have proceeded differently in the case of a similar accusation against a person of a different race. *See Pyke*, 258 F.3d at 109 (noting that "a plaintiff alleging a claim of selective *prosecution* in violation of the Equal Protection Clause must plead and establish the existence of similarly situated individuals who were not prosecuted"). Belmont is therefore entitled to summary judgment as to Plaintiff's Section 1983 claims.

Defendants also argue, correctly, that there is insufficient evidence of personal involvement by Malfitano to subject him to Section 1983 liability. (Defs.' Reply Mem. 9-10.) "Evidence of a supervisory official's 'personal involvement' in the challenged conduct is required" to hold that official liability under Section 1983. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003). "'Personal involvement' is not limited to direct participation by the supervisor in the challenged conduct, but may also be established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Id.* There is no evidence that Malfitano directly participated in any action taken against Plaintiff. Nor has Plaintiff presented any evidence from which a reasonable jury could conclude that Malfitano learned of any facts that would have indicated that Harrison employees' treatment of Plaintiff was motivated by racial animus, or that Harrison had any custom or policy of racial discrimination, *see infra* Section II.G. Nor is there any evidence in the record suggesting that Malfitano was grossly negligent in supervising the Police Department or Recreation Department

36

or that he was deliberately indifferent to Plaintiff's rights.  To the contrary, the evidence is that upon receiving Plaintiff's letter of May 7, 2003, Malfitano referred the letter to Harrison's law department and discussed the situation with Belmont, satisfying himself that the Police and Recreation Departments had handled the situation appropriately.  Nothing in Plaintiff's rambling May 7, 2003 letter or elsewhere in the record could lead to a jury's finding that Malfitano knew or should have known that Plaintiff's arrest had been racially motivated.  *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (affirming summary judgment and holding that "no material facts exist that could support a jury finding of [defendant school superintendent's] liability under § 1983," in the absence of any "allegation that [he] engaged directly in any discriminatory conduct," even if subordinates "did, in fact, intend to discriminate against [plaintiff]," where the superintendent "judged [the subordinates'] motives differently"); *Hayut*, 352 F.3d at 753-54 (affirming summary judgment where plaintiff alleging harassment by a professor "makes no claim and provides no evidence that the individual defendants directly participated in any of [the professor's] harassment," or that they "created or allowed a policy to continue under which alleged harassment could occur, or that they were grossly negligent in monitoring [the professor's] conduct").

E.  Section 1981 Claim

Plaintiff asserts a Section 1981 claim against all Defendants, alleging that "[t]he wrongful acts described [in the Amended Complaint] were purposefully discriminatory and motivated and instigated by racial animus against people of African-American origin."  (AC ¶ 58.)  Defendants argue that they are entitled to summary judgment because Plaintiff "cannot point to any racial animus which led to the events which occurred."  (Defs.' Mem. 17.)

37

Section 1981 protects the right of "[a]ll persons within the jurisdiction of the United States . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000); *see also Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 368 (S.D.N.Y. 2006) ("[D]iscriminatory intent is a necessary element of a § 1981 claim."). "[P]laintiffs must meet the same pleading standard for their § 1981 claims as for their § 1983 claims under the Equal Protection Clause . . . ." *Brown*, 221 F.3d at 339; *see also Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 41 n.3 (E.D.N.Y. 2009) ("[D]iscrimination . . . claims brought under Sections 1981 and 1983 are analyzed the same as those brought pursuant to Title VII."); *Philippeaux v. County of Nassau*, 921 F. Supp. 1000, 1007-08 (E.D.N.Y. 1996) ("[T]he analysis for determining whether the plaintiff has established a prima facie case of discrimination through circumstantial evidence is the same under Title VII as it is under . . . 42 U.S.C. §§ 1981 and 1983 . . . .").

For the same reasons discussed above with respect to Plaintiff's equal protection claims, *see supra* Section II.D, the Court concludes that all Defendants except Bisceglia, Chiarella, and Minishi are entitled to summary judgment as to Plaintiff's Section 1981 claims.

F.  Section 2000a Claim

Plaintiff asserts a Section 2000a claim against all Defendants, alleging that "[t]he wrongful acts described [in the Amended Complaint] were purposefully discriminatory and

38

motivated and instigated by racial animus against people of African-American origin," and seeking, inter alia, "to enjoin [Defendants] from future acts of racial discrimination."  (AC ¶¶ 66, 72.)  Defendants argue that they are entitled to summary judgment because Plaintiff "cannot point to any racial animus which led to the events which occurred."  (Defs.' Mem. 17.)

Section 2000a guarantees "[a]ll persons . . . the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . , without discrimination or segregation on the ground of race, color, religion, or national origin."  42 U.S.C. § 2000a(a); *see also Gibbs-Alfano v. Burton*, 281 F.3d 12, 16 (2d Cir. 2002) (stating that Section 2000a "guarantees individuals full and equal enjoyment of places of public accommodation without race-based discrimination").  "[A] plaintiff alleging a violation of Section 2000a must allege facts which show that he was deprived of equal use and enjoyment of a covered facility's services and facts which demonstrate discriminatory intent.  A plaintiff may prove discriminatory intent, motive, or purpose by direct evidence or by circumstantial evidence, including evidence of the difference in treatment."  *Thomas v. Tops Friendly Markets, Inc.*, No. 96-CV-1579, 1997 WL 627553, *5 (N.D.N.Y. Oct. 8, 1997).  "[T]he Second Circuit [has] looked to Title VII and Section 1981 cases for guidance to determine whether racial discrimination actually occurred in a Section 2000a case," and "[d]istrict courts have applied similar standards."  *Id.* (citing *Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1340-41 (2d Cir. 1974) and *Perry v. Burger King Corp.*, 924 F. Supp. 548, 552 (S.D.N.Y. 1996)).

For the same reasons discussed above with respect to Plaintiff's Section 1983 and Section 1981 claims, *see supra* Sections II.D and II.E, the Court concludes that all Defendants except Bisceglia, Chiarella, and Minishi are entitled to summary judgment as to Plaintiff's

Section 2000a claims.

### G.  Section 1983 Claims Against Harrison

Plaintiff's Amended Complaint asserts that Harrison is liable for all claims (a) "under the theory of *respondeat superior*, to the extent that the Individual Defendants were acting in their official capacities," (b) "to the extent that [Harrison] directly participated in the wrongdoing alleged," and (c) "to the extent that the deprivation of rights complained of became an actual and/or de facto policy of [Harrison] and w[as] undertaken and enacted by the top policy makers of [Harrison]."  (AC ¶ 12.)  Harrison asserts that it is entitled to summary judgment as to all of Plaintiff's Section 1983 claims, on grounds that respondeat superior is not grounds for imposing Section 1983 liability on a municipality and that Plaintiff has not adduced evidence from which a reasonable jury could conclude that any of the alleged violations of Plaintiff's rights were caused by a municipal policy.  (Defs.' Mem. 17-19.)

The Supreme Court has held that "the language of § 1983, read against the background of the . . . legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  To "prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove:  (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  The fifth element derives from the principle that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403

40

(1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of *respondeat superior*."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnmental bodies can act only through natural persons, . . . [and] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").  Moreover, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]."  *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) (same).  In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404).

    "In determining municipal liability, it is necessary to conduct a separate inquiry into

41

whether there exists a 'policy' or 'custom.'"  *Davis v. City of New York*, 228 F.Supp.2d 327, 336

(S.D.N.Y. 2002).  Both municipal policies and municipal customs can be grounds for *Monell*

liability.  "The Supreme Court has identified at least two situations that constitute a municipal

policy:  (1) where there is an officially promulgated policy as that term is generally understood

(*i.e.*, a formal act by the municipality's governing body), and (2) where a single act is taken by a

municipal employee who, as a matter of State law, has final policymaking authority in the area in

which the action was taken."  *Newton*, 566 F. Supp. 2d at 271 (citing *Monell*, 436 U.S. at 690,

and *Pembaur*, 475 U.S. at 480-81).  "A municipal 'custom,' on the other hand, need not receive

formal approval by the appropriate decisionmaker . . . ."  *Id.*  Instead, "an act performed pursuant

to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly

subject a municipality to liability on the theory that the relevant practice is so widespread as to

have the force of law."  *Brown*, 520 U.S. at 404; *see also Kern v. City of Rochester*, 93 F.3d 38,

44 (2d Cir. 1996) (noting that a municipality's custom "need not be memorialized in a specific

rule or regulation").  To prevail on this theory of municipal liability, however, a plaintiff must

prove that the custom at issue is well-settled.  *See Praprotnik*, 485 U.S. at 127 (noting that the

Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a

widespread practice that, although not authorized by written law or express municipal policy, is

'so permanent and well settled as to constitute a "custom or usage" with the force of law'"

(quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970))).

       Plaintiff argues that he has established a genuine issue of material fact as to Harrison's

*Monell* liability for the alleged violations of Plaintiff's federal rights because he has adduced

evidence that (a) police officers "up to at least the Lieutenant level" were "engaged in falsifying

evidence" against Plaintiff, (b) the May 31 detention of Plaintiff and Jaffe "apparently warranted multiple police officers and police cars," (c) Harrison's mayor, Malfitano, "checked into" and was "satisfied with the manner in which Plaintiff was being handled," (d) Belmont, who made the decision to exclude Plaintiff from the Park, was a municipal policymaker, and (e) a police officer "complained to the Department that he feared the Department was susceptible to claims of racial profiling."  (Pl.'s Mem. 23-24.)

This proffer of evidence is insufficient to enable Plaintiff's *Monell* claims against Harrison to withstand summary judgment.  First, Plaintiff has adduced no evidence that Bisceglia (or any other police lieutenant) was a municipal policymaker for *Monell* purposes, and so any evidence that lieutenants were involved in the alleged violations of Plaintiff's rights is not evidence of a municipal policy or custom.[17]  *See Kaufman v. City of New York*, No. 87-CV-4492, 1992 WL 247039, at *3 (S.D.N.Y. Sept. 17, 1992) (granting summary judgment on *Monell* claim where plaintiff "fail[ed] to submit evidence . . . that [the police] [s]ergeant [who ordered his arrest] . . . was a municipal policy maker with final decision making authority regarding his arrest," and noting that "[a]n officer making an arrest is not establishing policy").  Second, and similarly, the fact that multiple police officers were involved in detaining Plaintiff on May 31, 2003 is unrelated to whether the detention was done pursuant to a municipal policy or custom of racial discrimination or of unconstitutionally unreasonable detentions.  Third, there is no evidence from which a reasonable jury could conclude that Malfitano's "check[ing] into"

_____

[17] The Court notes that it is undisputed that the decision to exclude Plaintiff from the Park was made solely by Belmont in his discretion as Recreation Department Commissioner. Belmont's testimony that Chiarella (who was a police detective, not a lieutenant) also expressed his view that Plaintiff should be excluded does not create an issue of fact as to whether Chiarella, or any other police officer, was a municipal policymaker for purposes of that decision.

Plaintiff's case would have alerted him to the fact that the police officers and other city employees involved were motivated by racial animus in their treatment of Plaintiff, and Plaintiff offers no evidence suggesting that Malfitano bore any personal responsibility for the acts Plaintiff complains of in this case.[18]   *See supra* Section II.D.   Fourth, assuming that Belmont was a municipal policymaker and that his decision to exclude Plaintiff from the Park was therefore done pursuant to a Harrison policy, there is no evidence that Belmont ordered Plaintiff's exclusion from the Park due to Plaintiff's race.   *See supra* Section II.D.   The evidence is that Belmont had no first-hand knowledge of Plaintiff's behavior in the Park (or even Plaintiff's race) and made the decision to exclude him based on the fact of his arrest for harassment, and Plaintiff has presented no evidence from which a jury could conclude that Belmont would have acted differently had an individual of a different race been arrested for harassment in the Park.

Finally, Plaintiff points to statements made to the Harrison Police Department by Peter DeVittorio, a Harrison police sergeant, that DeVittorio believed the Department could be "susceptible to claims of racial profiling."  (Pl.'s Mem. 24.)  The record evidence on this point is plainly insufficient to raise a genuine issue of material fact as to whether Harrison had a policy or custom of discriminatory policing, or even of tolerating discriminatory policing.  At his deposition, DeVittorio testified that he had notified the Department, by letter, that he "believed that the percentages of arrests didn't seem to be very balanced, and that there seemed to be more of an inordinant amount of minority arrests coming in."  (Torczyner Reply Decl. Ex. B (Dep. of

---

[18] At oral argument, Plaintiff's counsel contended that Malfitano's investigation would have produced evidence that Plaintiff's arrest was racially motivated, arguing that he could "imagine" what Malfitano might have discovered.  This choice of words underscores the extent to which Plaintiff's *Monell* claim is based on the barest conjecture.

Peter DeVittorio ("DeVittorio Dep.") 18).)  DeVittorio recalled that he had written the letter

sometime prior to the fall of 2004, but he did not know whether it was before or after Plaintiff's

arrest.  (*Id.* 19-20.)  Also, DeVittorio did not perceive that the Department was actually

practicing intentional racial discrimination in its policing; he did not believe that "minorities in

Harrison would get arrested more frequently than white people," that "minorities would get a

little more scrutiny when they came into Harrison than a white person might," or that "any

officers within the Harrison police department were engaging in racial profiling."  (*Id.* 20-23.)

Rather, DeVittorio's concern was that a statistical analysis of arrests in Harrison *might* show that

the Department's practices had a disparate impact on racial minorities, i.e., that "the amount of

arrests that were coming in . . . percentage[-]wise was something that would actually lead to

leaving the town and the police department *open to litigation* that would *suppose* that we were

racially profiling."  (*Id.* 20-21 (emphases added).)  DeVittorio noted that following his

expression of his views the Department held a "training session" that "kind of addressed [his]

concerns," though not "to the level [he] thought . . . was appropriate."  (*Id.* 19.)

Even assuming that the mere existence of a racial disparity in arrests by the Harrison

Police Department could be evidence of a municipal policy of discrimination actionable under

Section 1983, Plaintiff has provided no evidence of such a disparity, as DeVittorio's conjecture

that such a disparity "seemed" to exist is unsupported by any facts.  The only pieces of evidence

on this issue are documents that Defendants identify as Harrison's "arrest records for the period

of January 2000 through June 2004"; Defendants contend that these records "show[] that only

three (3) of the one hundred and thirty[-]one (131) people arrested by the Harrison police [during

that time period] were classified as 'Black.'"  (Defs.' Reply Mem. 9; Torczyner Reply Decl. Ex.

C (Arrest Records).)  Regardless of whether this data is accurate or whether Defendants'

representation of the data is correct,[19] there is no evidence before the Court that would allow a

jury to interpret such information for purposes of drawing any inference about whether the

Harrison Police Department actually practiced racial profiling.[20]

Accordingly, Harrison is entitled to summary judgment as to Plaintiff's Section 1983

claims.

### III.  Conclusion

For the reasons stated herein, Defendants' motion for partial summary judgment is

granted in part and denied in part.  Plaintiff's Section 1983 claim against Tancredi for

unreasonable detention on May 31, 2003 is dismissed with prejudice.  Plaintiff's remaining

Section 1983 claims for unreasonable detention on May 31, 2003 and for unlawful entry into

Plaintiff's house on or about June 2, 2003 are dismissed without prejudice, due to Plaintiff's

failure to identify the individuals involved.  Plaintiff's Section 1983 due process claim for

wrongful exclusion from the Park is dismissed with prejudice.  Plaintiff's federal claims against

---

[19] It appears to the Court that the records indicate five dates on which African-American individuals were arrested:  April 11, 2001; March 22, 2002; April 22, 2002; May 3, 2003; and June 28, 2004.  (Arrest Records 2-5.)

[20] Plaintiff also protests that summary judgment as to his *Monell* claim against Harrison is inappropriate because of Defendants' failure to produce DeVittorio's letter.  (Pl.'s 56(f) ¶¶ 2-3.) Defendants respond, as they did with respect to Plaintiff's statement pertaining to photographs of Harrison police officers, *see supra* Section II.B.3, that Plaintiff was ordered to serve Defendants with a written request for DeVittorio's letter — which Plaintiff's counsel also promised to do during DeVittorio's deposition — but failed to do so.  (Defs.' Reply Mem. 8; DeVittorio Dep. 18.)  Regardless, DeVittorio's deposition testimony clearly demonstrates that his letter would not provide any evidence that could create a genuine issue of material fact as to the Harrison Police Department's policies; as DeVittorio testified, his letter merely voiced his speculation as to a possible racial imbalance in arrests, and did not contain or suggest any evidence of intentional racial discrimination within the Department.

Harrison are dismissed with prejudice. All claims against Tancredi, Belmont, Malfitano, and the John Does are dismissed with prejudice, and those Defendants are dismissed from this case. Plaintiff's remaining claims are his equal protection, malicious prosecution, and false arrest claims pursuant to Section 1983, all against Bisceglia, Chiarella, and Minishi; his Section 1981 and Section 2000a claims against Bisceglia, Chiarella, and Minishi; and his state law claims for malicious prosecution and false arrest, against Bisceglia, Chiarella, Minishi, and Harrison. The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 27), and to terminate all Defendants *except* Bisceglia, Chiarella, Minishi, and Harrison.

SO ORDERED.

Dated:      September 30, 2009
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (by ECF):

Joseph R. DeMatteo, Esq.
DeMatteo & Bernfeld, LLP
275 Madison Avenue, Suite 1000
New York, NY 10016

Steven J. Harfenist, Esq.
Friedman, Harfenist, Langer & Kraut
3000 Marcus Avenue
Lake Success, NY 11042
sharfenist@friedharf.com

Charles H. Horn, Esq.
Friedman, Harfenist, Langer & Kraut
3000 Marcus Avenue
Lake Success, NY 11042
chorn@friedharf.com

Neil S. Torczyner, Esq.
Friedman, Harfenist, Langer & Kraut
3000 Marcus Avenue
Lake Success, NY 11042
ntorczyner@friedharf.com